UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Dominion Capital LLC,

                            Plaintiff,

               -against-

ShiftPixy, Inc.,

                          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**19 CV 6704**

Case No. _____

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Dominion Capital LLC ("Dominion Capital" or "Plaintiff"), by its attorneys, Sullivan & Worcester LLP, for its Complaint against ShiftPixy, Inc. ("PIXY" or "Defendant"), states as follows:

## NATURE OF THE ACTION

      1.     This is an action to: (1) obtain injunctive relief directing Defendant to honor stock conversion notices served by Plaintiff; (2) obtain injunctive relief from the Court enjoining Defendant from its proposed buyback of ten million shares of its common stock; (3) recover damages based on the breach of three sets of transactional documents between Plaintiff and Defendant; and (4) obtain a declaratory judgment against PIXY clarifying, affirming and declaring that (a) Dominion Capital received the Notes (as defined herein) in exchange for good and valuable consideration and that Dominion Capital has the right to demand and receive common stock and payments due and owing under the Notes; (b) PIXY violated its duties and obligations to act in accordance with the Notes; (c) PIXY is in default under the Notes; and (d)

the proposed buyback in the July 12, 2019 press release is in violation of PIXY's obligations to Dominion Capital under the Notes.

2.      Defendant has intentionally defaulted on the three sets of transactional documents at issue in this case and refused to honor Plaintiff's lawful demand for stock conversion, per the terms of the various transactional documents.

3.      Defendant's financial viability is in jeopardy.  Public securities filings indicate that Defendant's liabilities far outweigh its assets.

4.      Defendant has begun defaulting on its debts.  On June 27, 2019, Defendant filed a Form 8-K stating that it will "cease honoring conversion requests of the 2018 Notes and 2019 Notes forcing a voluntary default of these instruments." That admission of breach, covering the June 2018 Note, the December 2018 Note and the March 2019 Note (each defined below, together, the "Notes") in this case, is the basis for this action.

5.      In spite of such a default, and in direct contravention of a prohibition set forth in Plaintiff's debt instruments, Defendant issued a press release on July 12, 2019, stating that it intends to buy back approximately ten million shares of its common stock.

6.      If Defendant is permitted to conduct the buyback of its common stock, it will use nearly all of its remaining assets for purposes other than paying back its creditors and will be unable to pay Plaintiff in the likely event that Plaintiff obtains a judgment through this action.

7.      The parties agreed, as set forth in each of the promissory notes contained in the three sets of transactional documents, that Dominion Capital would be entitled to preliminary injunctive relief in the event PIXY failed to deliver stock upon receipt of a conversion notice ("Conversion Notice").  As set forth in paragraph 9(g) of each of the Notes:

> The [Defendant] acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to [Plaintiff] and that the

remedy at law for any such breach may be inadequate.   The [Defendant] therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any such breach or threatened breach, without the necessity of showing economic loss and without any bond or security being required.

8.      Plaintiff now seeks, in addition to relief on its clear-cut breach of contract claims, immediately to enforce the agreed upon injunctive relief as set forth in the transactional documents.

## THE PARTIES

9.      Plaintiff Dominion Capital LLC is a Connecticut limited liability company with its principal place of business in New York, New York.   Dominion Capital is a private company that invests in securities and related instruments.   The sole member of Dominion Capital is Dominion Capital Holdings, LLC, a Delaware LLC whose members are all domiciled in New York, Connecticut and Russia.

10.      Defendant ShiftPixy, Inc. is a Wyoming corporation with its principal place of business at 1 Venture, Suite 150, Irvine, California 92618.   Defendant is a publicly traded company on the Nasdaq Capital Market whose shares are traded under the ticker symbol "PIXY."   According to its public filings, Defendant is a specialized staffing and human capital management service provider that provides solutions for large contingent part-time workforce demands, primarily in the restaurant, hospitality and maintenance service trades.

## JURISDICTION AND VENUE

11.      This Court has subject matter jurisdiction over Plaintiff's claims in this action pursuant to 28 U.S.C. § 1332(a)(2) because Plaintiff is a citizen of a foreign state, and Defendant is a citizen of California and Wyoming, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the parties have designated this District as the stipulated venue for adjudication of their disputes.

13.     Defendant has consented to personal jurisdiction pursuant to the written instruments at issue herein.  Specifically, Section 9(d) of the Convertible Notes that PIXY issued in favor of Dominion Capital on or about June 19, 2018 and December 20, 2018, respectively (defined in further detail below), provides that:

> Each party agrees that all legal proceedings concerning the interpretation, enforcement and defense of the transactions contemplated by any of the Transaction Documents (whether brought against a party hereto or its respective Affiliates, directors, officers, shareholders, employees or agents) shall be commenced in the state and federal courts sitting in the City of New York, Borough of Manhattan (the "New York Courts"). Each party hereto hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of such New York Courts, or such New York Courts are improper or inconvenient venue for such proceeding.

14.     Section 26 of the Convertible Note that PIXY issued in favor of Dominion Capital on or about March 11, 2019, provides that:

> …the Company hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. Nothing contained herein (i) shall be deemed or operate to preclude the Holder from bringing suit or taking other legal action against the Company in any other jurisdiction to collect on the Company's obligations to the Holder, to realize on any collateral or any other security for such obligations, or to enforce a judgment or other court ruling in favor of the

Holder…

## **FACTUAL BACKGROUND**

15.     On or about June 4, 2018, Plaintiff purchased from Defendant a $2,500,000 face amount Senior Secured Convertible Note for $2,250,000 (the "June 2018 Note") and Warrant to purchase 251,004 shares of Defendant common stock.  The purchase was made pursuant to the terms and provisions of a securities purchase agreement dated June 4, 2018 (the "June 2018 SPA").  Copies of the June 2018 Note and June 2018 SPA are annexed hereto as Exhibit A.  In addition to the June 2018 Note, the June 2018 SPA and Warrant, the parties entered into a registration rights agreement, security agreement and intellectual property security agreement, all dated June 4, 2018 (the "June 2018 Transaction Documents").

16.     On or about December 20, 2018, Defendant issued to Plaintiff a second Senior Secured Convertible Note (the "December 2018 Note") in the principal amount of $222,222.22, a copy of which is annexed as Exhibit B.  The December 2018 Note was issued pursuant to a settlement agreement, also dated December 20, 2018, to cure defaults under the June 2018 Transaction Documents that, among other things, granted Plaintiff and other investors registration rights associated with the June 2018 investment.

17.     On or about February 5, 2019, Defendant informed Plaintiff and others that Defendant required an additional tranche of capital investment.

18.     On or about March 11, 2019, Plaintiff purchased from PIXY a $633,333.33 face amount Senior Secured Convertible Note for $500,000 (the "March 2019 Note") and Warrant to purchase 378,788 shares of Defendant common stock.  The purchase was made pursuant to the terms and provisions of a securities purchase agreement dated March 11, 2019 (the "March 2019 SPA").  Copies of the March 2019 Note and March 2019 SPA are annexed hereto as Exhibit C.

In addition to the March 2019 Note and the March 2019 SPA and Warrant, the parties entered into a registration rights agreement, security agreement and intellectual property security agreement, all dated March 11, 2019 (the "March 2019 Transaction Documents").

19.     These three convertible instruments offered maximum flexibility for both Plaintiff and Defendant:  Defendant had the ability to repay amounts owed in stock or in cash, depending on its cash needs.

20.     The convertible instruments provide several alternatives to Defendant paying to Plaintiff the face value of the instrument:  (a) the company can make monthly amortizations in cash; (b) the company can make monthly amortizations in stock (subject to equity conditions, which include a certain dollar volume as well as pricing requirements/thresholds); or (c) the investor can convert if the price of the common stock is above the fixed conversion price listed in the instruments.

21.     Like all notes, meeting the monthly amortization requirements is critical – these are the payments of principal and interest for which Plaintiff bargained.

22.     A second, equally important component is the negative covenants set forth in the Notes.  These covenants effectively restrict what the issuer can and cannot do while the Notes are outstanding.  Chief among those restrictions in Section 7(d) are adding new debt without the approval of the note holders (Plaintiff) and taking cash to repurchase common stock.

23.     Section 2(a) of the June 2018 Note and the December 2018 Note provides that:

> The Company shall pay interest to the Holder on the aggregate unconverted and then outstanding principal amount of this Note at the rate of 8% per annum, payable monthly, beginning on the first such date after the Original Issue Date, on each Conversion Date (as to that principal amount then being converted), on each Optional Redemption Date (as to that principal amount then being redeemed), on each Mandatory Redemption Date (as to that principal amount then being redeemed) and on the Maturity Date (each such date, an "Interest Payment Date") (if any Interest Payment Date is not a Business Day, then the applicable payment

shall be due on the next succeeding Business Day), in cash. The initial twelve (12) months' interest amount shall be guaranteed and the remaining unpaid portion thereof shall be accelerated and payable in connection with any conversion of this Note (the "Make Whole").

24.   Section 2 of the March 2019 Note provides that there is no current interest payment required on that Note except in the case of an "Event of Default," as defined in the March 2019 Note.

25.   Section 8(a)(i) of the June 2018 Note and the December 2018 Note provides that it shall be an "Event of Default" if there is

> any default in the payment of (A) the principal amount of any Note or (B) interest, liquidated damages and other amounts owing to a Holder on any Note, as and when the same shall become due and payable (whether on a Conversion Date, Optional Redemption Date, Mandatory Redemption Date or the Maturity Date or by acceleration or otherwise) which default, solely in the case of an interest payment or other default under clause (B) above, *is not cured within 3 Trading Days*.... (Emphasis added)

26.   Section 8(a)(xi) of the June 2018 Note and the December 2018 Note provides that it shall be an "Event of Default" if Defendant fails to deliver common stock to Plaintiff.

27.   Section 4(a)(xiii) of the March 2019 Note provides that it shall be an "Event of Default" if:

> the Company and/or any Subsidiary, individually or in the aggregate, either (i) fails to pay, when due, or within any applicable grace period, any payment with respect to any Indebtedness in excess of $50,000 due to any third party (other than, with respect to unsecured Indebtedness only, payments contested by the Company and/or such Subsidiary (as the case may be) in good faith by proper proceedings and with respect to which adequate reserves have been set aside for the payment thereof in accordance with GAAP) or is otherwise in breach or violation of any agreement for monies owed or owing in an amount in excess of $50,000, which breach or violation permits the other party thereto to declare a default or otherwise accelerate amounts due thereunder, or (ii) suffer to exist any other circumstance or event that would, with or without the passage of time or the giving of notice, result in a default or event of default under any agreement binding the Company or any Subsidiary, which default or event of default would or is likely to have a material adverse effect on the business, assets, operations (including results thereof), liabilities, properties, condition (including financial

condition) or prospects of the Company or any of its Subsidiaries, individually or in the aggregate.

28.     Section 8(a)(vi) of the June 2018 Note and December 2018 Note provides for the cross-default of either or both Notes when:

> the Company or any Subsidiary shall default on any of its obligations under any mortgage, credit agreement or other facility, indenture agreement, factoring agreement or other instrument under which there may be issued, or by which there may be secured or evidence, any indebtedness for borrowed money or money due under any long term leasing or factoring arrangement that (a) involves an obligation greater than $150,000, whether such indebtedness now exists or shall hereafter be created, and (b) results in such indebtedness becoming or being declared due and payable prior to the date on which it would otherwise become due and payable.

29.     Section 4(a)(viii) of the March 2019 Note provides for the cross-default of the Note upon: "the occurrence of any default under, redemption of or acceleration prior to maturity of at least an aggregate of $50,000 of Indebtedness (as defined in the Securities Purchase Agreement) of the Company or any of its Subsidiaries, other than with respect to any Other Notes."

30.     These provisions are meant to ensure that Defendant does not use its cash for purposes inconsistent with the obligations set forth in the Notes.

Defendant's Default

31.     Under the terms of the June 2018 Note, Defendant was obligated to make an interest payment to Dominion Capital of $268,333.33 on June 3, 2019.

32.     On June 3, 2019, Plaintiff emailed Defendant to confirm that such payment would be made as provided in the June 2018 Transaction Document. Defendant's CEO, Scott Absher, responded:

> "Not happening.
>
> Our lawyers will be in touch."

33.     Plaintiff responded to Defendant's email as follows:

"I believe you have until Wed 6pm to make the payment, as allowed by the cure period. My intention is to resolve this amicably."

34.     Neither Mr. Absher nor any other representative of Defendant responded. A copy of the above e-mail exchange is annexed hereto as Exhibit D.

35.     Defendant failed to make that payment and failed to cure such default within the three (3) Trading Days as set forth in the June 2018 Note.

36.     On or about June 7, 2019, Plaintiff sent to Defendant via electronic mail and [overnight delivery] a default notice regarding the June 2018 Note, including a notice of cross default with respect to the December 2018 Note and the March 2019 Note. A copy of that default notice is annexed hereto as Exhibit E.

37.     Plaintiff received no response or other correspondence from Defendant nor was any payment made.[1]

### Defendant's Delay in SEC Filings

38.     General Instruction A.1 of Form 8-K provides that: "Form 8-K shall be used for current reports under Section 13 or 15(d) of the Securities Exchange Act of 1934, filed pursuant to Rule 13a-11 or Rule 15d-11 and for reports of nonpublic information required to be disclosed by Regulation FD (17 CFR 243.100 and 243.101)."

39.     General Instruction B.1 of Form 8-K provides that: "A report on this form is required to be filed or furnished, as applicable, upon the occurrence of any one or more of the events specified in the items in Sections 1 - 6 and 9 of this form. Unless otherwise specified, a report is to be filed or furnished within four business days after occurrence of the event. If the event occurs on a Saturday, Sunday or holiday on which the Commission is not open for

---

[1] Plaintiff has receive no amortization payments on any Note since this failure to make payment.

business, then the four business day period shall begin to run on, and include, the first business day thereafter."

40.     Item 2.04 of Form 8-K requires a public issuer to provide disclosure regarding: "Triggering Events That Accelerate or Increase a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement."

41.     Defendant was required to file a Form 8-K advising the market of its default on the Notes no later than June 13, 2019.

42.     On June 27, 2019, Defendant finally filed a Form 8-K advising the public of the defaults declared by Plaintiff and at least one other investor.

43.     Section 5.4 of the June 2018 SPA provides in pertinent part that: "To the extent that any notice provided pursuant to any Transaction Document constitutes, or contains, material, non-public information regarding the Company or any of the Subsidiaries, the Company shall simultaneously file such notice with the Commission pursuant to a Current Report on Form 8-K."

44.     Section 8(a)(ii) of the June 2018 Note and December 2018 Note provides for an Event of Default in the event that "the Company shall fail to observe or perform any other covenant, obligation, or agreement contained in the Notes (other than a breach by the Company of its obligations to deliver shares of Common Stock to the Holder upon conversion, which breach is addressed in clause (xi) below) or in any Transaction Document, which failure is not cured, if possible to cure, within the earlier to occur of (A) 5 Trading Days after notice of such failure sent by the Holder or by any other Holder to the Company and (B) 10 Trading Days after the Company has become or should have become aware of such failure."

45.     The failure to file a timely Form 8-K to disclose the default on the June 2018 Note and the cross default on the December 2018 and March 2019 Note was itself a separate default under the June 2018 Transaction Documents.

<u>Plaintiff's Efforts to Mitigate Damages</u>

46.     Section 30(g) of the March 2019 Note defines the term "Alternate Conversion Percentage" as, among other things, "with respect to any given Alternate Conversion, [] if such Alternate Conversion is an Alternate Event of Default Conversion as a result of either a Bankruptcy Event of Default or an Event of Default arising under Section 4(a)(vi) above, 75%."

47.     The effect of this section is to permit the Plaintiff, upon default of Defendant, to sell shares of stock at the greater of the floor prior or the lower of (i) the Conversion Price then in effect, and (ii) Alternate Conversion Percentage of the lowest VWAP of the Common Stock during the ten (10) consecutive Trading Day period ending and including the Trading Day immediately prior to the applicable Conversion Date.  Section 8(b) of the June 2018 Note and the December 2018 Note provides a similar remedy upon an event of default: "Without limiting the foregoing, during the continuance of an Event of Default, a Holder may convert this Note at a Conversion Price equal to 75% of the lowest VWAP of the Common Stock from the time of the occurrence of an Event of Default until such Event of Default is cured."

48.     The purpose of this remedy in each of the Notes is to provide the Plaintiff with the ability to trade out of such Note during what may be extreme periods of volatility as a result of defaults.

49.     On or about June 25, 2019, Plaintiff attempted to convert a portion of the March 2019 Note.  Section 3(a) of the March 2019 Note provides, in relevant part, that "at any time or times on or after the Issuance Date, the Holder shall be entitled to convert any portion of the

outstanding and unpaid Conversion Amount (as defined below) into validly issued, fully paid and non-assessable shares of Common Stock in accordance with Section 3(c), at the Conversion Rate (as defined below)."

50.     On June 25, 2019, Absher, who, in addition to being Defendant's CEO also is Defendant's largest shareholder, responded in an email: "These conversions are rejected."  No reason was given for the rejection, nor was any provision of the March 2019 Note or any March 2019 Transaction Document cited to support or justify such rejection.

51.     When Plaintiff asked Absher for the basis for rejecting the conversion under the March 2019 Note, Absher responded on June 25, 2109: "We are preparing a form 25 to voluntarily delist the company.  The shares would not have any value."

52.     In response to Absher's email, Plaintiff reminded Absher that Defendant was obligated to deliver the shares pursuant to the March 2019 Transaction Documents within two business days of the default.

53.     Absher, without providing any basis or support, responded: "These conversions are rejected as you have been told."  A copy of this e-mail exchanged is annexed hereto as Exhibit F.

54.     Plaintiff again attempted to effect a conversion on July 5, 2019.  Copies of the Conversion Notice and sellers representation letter were duly submitted to Defendant on July 5, 2019.

55.     On July 5, Defendant's Chief Financial Officer, Patrice Launay, wrote to Plaintiff: "We deny the conversion" [sic.]  A copy of this exchange is attached hereto as Exhibit G.

56.     As of the date of this Complaint, each of the June 2018 Note, the December 2018 Note and the March 2019 Note remains in default.

The Parties' Agreed-Upon Relief

57.     Section 8(b) of the June 2018 Note and the December 2018 provides that in an

Event of Default:

> …the outstanding principal amount of this Note, plus accrued but unpaid interest, liquidated damages and other amounts owing in respect thereof through the date of acceleration, shall become, at the Holder's election, immediately due and payable in cash at the Mandatory Default Amount. Commencing five (5) days after the occurrence of any Event of Default that results in the eventual acceleration of this Note, the interest rate on this Note shall accrue at an interest rate equal to the lesser of 18% per annum or the maximum rate permitted under applicable law. Upon the payment in full of the Mandatory Default Amount, the Holder shall promptly surrender this Note to or as directed by the Company. In connection with such acceleration described herein, the Holder need not provide, and the Company hereby waives, any presentment, demand, protest or other notice of any kind, and the Holder may immediately and without expiration of any grace period enforce any and all of its rights and remedies hereunder and all other remedies available to it under applicable law. Such acceleration may be rescinded and annulled by Holder at any time prior to payment hereunder and the Holder shall have all rights as a holder of the Note until such time, if any, as the Holder receives full payment pursuant to this Section 8(b). No such rescission or annulment shall affect any subsequent Event of Default or impair any right consequent thereon. Without limiting the foregoing, during the continuance of an Event of Default, a Holder may convert this Note at a Conversion Price equal to 75% of the lowest VWAP of the Common Stock from the time of the occurrence of an Event of Default until such Event of Default is cured.

58.     The June 2018 Note and the December 2018 Note define the "Mandatory Default

Amount" as:

> the sum of (a) the greater of (i) the outstanding principal amount of this Note, plus all accrued and unpaid interest hereon and Make Whole, divided by the Conversion Price on the date the Mandatory Default Amount is either (A) demanded (if demand or notice is required to create an Event of Default) or otherwise due or (B) paid in full, whichever has a lower Conversion Price multiplied by the highest VWAP for the Common Stock on the Trading Market during the period beginning on the date of first occurrence of the Event of Default and ending on the date the Mandatory Default Amount is either (x) demanded or otherwise due or (y) paid in full, or (ii) 130% of the outstanding principal amount of this Note, plus 100% of accrued and unpaid interest hereon and Make Whole, and (b) all other amounts, costs, expenses and liquidated damages due in respect of this Note. For the avoidance of doubt the calculation of such Mandatory

Default Amount shall be calculated by the following formula: (Principal + Interest + Costs + Expenses + Liquidated Damages)\*130%.

59.     Section 4(b) of the March 2019 Note provides that in an Event of Default:

Each portion of this Note subject to redemption by the Company pursuant to this Section 4(b) shall be redeemed by the Company at a price equal to the greater of (i) the product of (A) the Conversion Amount to be redeemed multiplied by (B) the Redemption Premium and (ii) the product of (X) the Conversion Rate with respect to the Conversion Amount in effect at such time as the Holder delivers an Event of Default Redemption Notice multiplied by (Y) the product of (1) the Redemption Premium multiplied by (2) the greatest Closing Sale Price of the Common Stock on any Trading Day during the period commencing on the date immediately preceding such Event of Default and ending on the date the Company makes the entire payment required to be made under this Section 4(b) (the "**Event of Default Redemption Price**"). Redemptions required by this Section 4(b) shall be made in accordance with the provisions of Section 11. To the extent redemptions required by this Section 4(b) are deemed or determined by a court of competent jurisdiction to be prepayments of this Note by the Company, such redemptions shall be deemed to be voluntary prepayments. Notwithstanding anything to the contrary in this Section 3(e), but subject to Section 3(d), until the Event of Default Redemption Price (together with any Late Charges thereon) is paid in full, the Conversion Amount submitted for redemption under this Section 4(b) (together with any Late Charges thereon) may be converted, in whole or in part, by the Holder into Common Stock pursuant to the terms of this Note. In the event of the Company's redemption of any portion of this Note under this Section 4(b), the Holder's damages would be uncertain and difficult to estimate because of the parties' inability to predict future interest rates and the uncertainty of the availability of a suitable substitute investment opportunity for the Holder. Accordingly, any redemption premium due under this Section 4(b) is intended by the parties to be, and shall be deemed, a reasonable estimate of the Holder's actual loss of its investment opportunity and not as a penalty. Any redemption upon an Event of Default shall not constitute an election of remedies by the Holder, and all other rights and remedies of the Holder shall be preserved.

60.     As a result of Defendant's default, Plaintiff is entitled to recover the "Mandatory Default Amount" set forth in Section 8(b) of June 2018 Note, plus interest at the rate of 1.5% per month on the foregoing, also as required by Section 8(b), as well as its attorneys' fees.

61.     The amount due and owing on the June 2018 Note as of July 16, 2019 is in excess of $925,000, and will continue to increase as interest accumulates.

62.     As a result of Defendant's default, Plaintiff is entitled to recover the "Mandatory Default Amount" set forth in Section 8(b) of December 2018 Note, plus interest at the rate of 1.5% per month on the foregoing, also as required by Section 8(b), as well as its attorneys' fees. The amount due and owing on the December 2018 Note as of July 16, 2019 is in excess of $305,000, and will continue to increase as interest accumulates.

63.     As a result of Defendant's default, Plaintiff is entitled to recover the "Default Rate" set forth in Section 2(a) of March 2019 Note, plus interest at the rate of 1.5% per month on the foregoing, as well as its attorneys' fees as provided in Section 19 of the March 2019.  The amount due and owing on the March 2019 Note as of July 16, 2019 is in excess of $736,000, and will continue to increase as interest accumulates.

## AS AND FOR A FIRST CLAIM FOR RELIEF
### (Injunction to Deliver Shares)

64.     Plaintiff repeats and re-alleges the allegations of Paragraphs 1 through 63 as if fully set forth herein.

65.     Recognizing that Defendant seemingly lacked sufficient cash in order to repay the June 2018 Note, the December 2018 Note and the March 2019 Note, and in order to mitigate damages, Plaintiff submitted Conversion Notices for the March 2019 Note at the conversion prices called for therein.

66.     Rather than abiding by its obligations set forth in the Conversion Notices to deliver common stock to Plaintiff according to the terms and conditions of the Notes, Defendant rejected the Conversion Notices.

67.     Had Defendant not breached its duties and obligations set forth in the March 2019 Transaction Documents, Plaintiff would have been able to obtain common stock pursuant to its

conversion rights as set forth in the March 2019 Note and thereby reduce its principal balance on the March 2019 Note.

68.    As a direct and proximate result of Defendant's breach of its duties and obligations, and instead obstructing and denying Plaintiff's right to convert its Notes, receive the shares of Defendant's common stock called for in the Notes, and sell such shares, Plaintiff was unable to reduce its principal on the Notes.

69.    In Defendant's Form 8-K dated June 27, 2019, Defendant acknowledged that it will cease honoring conversion requests of 2018 and 2019 Notes, forcing a voluntary default of those instruments.   As such, Defendant has admitted that it is in breach of its contractual obligations to Plaintiff.

70.    The parties agreed in the transactional documents that Defendant's failure to honor Plaintiff's conversion requests would entitle Plaintiff to equitable relief without the need to make any additional showing.

71.    Plaintiff will lose all of its bargained-for benefit if it must wait until the end of trial to receive the stock owed under the Notes.   Defendant has agreed that Plaintiff is entitled to an injunction restraining any breach or threatened breach of its obligations under the Notes to avoid irreparable harm.   The balance of the equities tips decidedly towards Plaintiff.

72.    Plaintiff is entitled to injunctive relief requiring Defendant to honor the stock conversions served by Plaintiff by delivering forthwith 1,600,496 shares of validly issued, fully paid and non-assessable shares of common stock of PIXY to Plaintiff.

## AS AND FOR A SECOND CLAIM FOR RELIEF
### (Injunction Prohibiting Share Buyback)

73.    Plaintiff repeats and re-alleges the allegations of Paragraphs 1 through 72 as if fully set forth herein.

74.     Defendant put out a press release on July 12, 2019, stating its intention to buy back approximately ten million shares of common stock.

75.     Defendant is contractually prohibited from buying back common stock while it has amounts still due to Plaintiff on the Notes.

76.     If Defendant conducts the proposed buyback it is highly unlikely that it will have sufficient funds to pay an ultimate judgment to Plaintiff in this action.

77.     Plaintiff is entitled to injunctive relief enjoining Defendant from its proposed buyback of ten million shares of its common stock.

### AS AND FOR A THIRD CLAIM FOR RELIEF
### (Breach of Contract — June 2018 Note)

Plaintiff repeats and re-alleges the allegations of Paragraphs 1 through 77 as if fully set forth herein.

78.     The June 2018 Note is a valid and binding contract, enforceable according to its terms.

79.     Plaintiff has performed all of its obligations under the June 2018 Note.

80.     As a direct and proximate result of Defendant's breach of the June 2018 Note, Plaintiff is entitled to recover all sums due under the June 2018 Note, an amount estimated to exceed $925,000, plus attorneys' fees.

### AS AND FOR A FOURTH CLAIM FOR RELIEF
### (Breach of Contract — December 2018 Note)

81.     Plaintiff repeats and re-alleges the allegations of Paragraphs 1 through 80 as if fully set forth herein.

82.     The December 2018 Note is a valid and binding contract, enforceable according to its terms.

83.     Plaintiff has performed all of its obligations under the December 2018 Note.

84.     As a direct and proximate result of Defendant's breach of the December 2018 Note, Plaintiff is entitled to recover all sums due under the December 2018 Note, an amount estimated to exceed $305,000, plus attorneys' fees.

## AS AND FOR A FIFTH CLAIM FOR RELIEF
### (Breach of Contract — March 2019 Note)

85.     Plaintiff repeats and re-alleges the allegations of Paragraphs 1 through 84 as if fully set forth herein.

86.     The March 2019 Note is a valid and binding contract, enforceable according to its terms.

87.     Plaintiff has performed all of its obligations under the March 2019 Note.

88.     As a direct and proximate result of Defendant's breach of the March 2019 Note, Plaintiff is entitled to recover all sums due under the March 2019 Note, an amount estimated to exceed $736,000, plus attorneys' fees.

## AS AND FOR A SIXTH CLAIM FOR RELIEF
### (Declaratory Judgment)

89.     Plaintiff repeats and re-alleges the allegations of Paragraphs 1 through 88 as if fully set forth herein.

90.     Section 8(b) of the June 2018 Note and the December 2018 Note provides, among the remedies available to Plaintiff in an Event of Default, that "...[w]ithout limiting the foregoing, during the continuance of an Event of Default, a Holder may convert this Note at a Conversion Price equal to 75% of the lowest VWAP of the Common Stock from the time of the occurrence of an Event of Default until such Event of Default is cured."

91.     Section 3(e)(ii) of the March 2019 Note provides the conversion price upon an "Event of Default."  Specifically, Section 3(e)(ii) provides that:

> Alternate Conversion Upon an Event of Default. At any time during an Event of Default Redemption Right Period (or, if any default or event of default has occurred under any Indebtedness of the Company or any of its Subsidiaries (taking into account any grace period provided therein), any Event of Default Redemption Right Period that would be deemed to then exist hereunder assuming the acceleration of such Indebtedness as of the date of initial occurrence of such default or event of default thereunder, as applicable), regardless of whether the Holder has delivered an Event of Default Redemption Notice to the Company, the Holder may, at the Holder's option, (each, an "Alternate Event of Default Conversion" and together with each Alternate Optional Conversion, each, an "Alternate Conversion," and the date of such Alternate Event of Default Conversion, each, an "Alternate Event of Default Conversion Date", and together with each Alternate Optional Conversion Date, each, an "Alternate Conversion Date") all, or any part of, the Conversion Amount (such portion of the Conversion Amount subject to such Alternate Conversion, the "Alternate Event of Default Conversion Amount" and together with each Alternate Optional Conversion Amount, each, an "Alternate Conversion Amount") into shares of Common Stock at the applicable Alternate Conversion Price.

92.     Plaintiff attempted to convert its stock pursuant to the above provisions, but Defendant refused to honor the conversion.

93.     Plaintiff seeks a judgment from the Court clarifying, affirming and declaring that (1) Dominion Capital received the Notes in exchange for good and valuable consideration and that Dominion Capital has the right to obtain common stock or demand and receive payments due and owing under the Notes; (2) PIXY violated its duties and obligations to act in accordance with the Notes; (3) PIXY is in default under the Notes; and (4) the proposed buyback in the July 12, 2019 press release is in violation of PIXY's obligations to Dominion Capital under the Notes.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dominion Capital LLC demands judgment against Defendant as follows:

(a)     An injunction directing Defendant to honor the stock Conversion Notices served by Plaintiff and to issue immediately 1,600,496 shares of its common stock to Dominion Capital in order to honor the Conversion Notices submitted by Dominion Capital on June 25, 2019 and July 5, 2019;

(b)     An injunction enjoining Defendant from its proposed buyback of ten million shares of its common stock;

(c)     Money damages against PIXY on breach of contract claims for failure to make required payments under each of the June 2018 Note, the December 2018 Note and the March 2019 Note and all amounts due on acceleration of each of such Notes, in an amount to be determined at trial;

(d)     A declaratory judgment clarifying, affirming and declaring that (1) Dominion Capital received the Notes in exchange for good and valuable consideration and that Dominion Capital has the right to demand and receive common stock and payments due and owing under the Notes; (2) PIXY violated its duties and obligations to act in accordance with the Notes; (3) PIXY is in default under the Notes; and (4) the proposed buyback in the July 12, 2019 press release is in violation of PIXY's obligations to Dominion Capital under the Notes;

(e)     Attorneys' fees and costs in bringing this action in accordance with the terms of the June 2018 Transaction Documents, the December 2018 Transaction Documents and the March 2019 Transaction Documents; and

(f)     Such other relief as this Court may determine as fair and just.

## JURY DEMAND

Dominion Capital LLC demands a trial by jury of all issues so trial pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:   New York, New York
    July 18, 2019

Respectfully submitted,

SULLIVAN & WORCESTER LLP

By: _____
   Peter R. Ginsberg
1633 Broadway, 32nd Floor
New York, New York 10019
Telephone:  (212) 660-3000
Facsimile:  (212) 660-3001
prginsberg@sullivanlaw.com

*Attorneys for Plaintiff*