Sullivan
SULLIVAN & WORCESTER

Sullivan & Worcester LLP
1633 Broadway
New York, NY 10019

212 660 3000
sullivanlaw.com

By ECF

September 27, 2019

Honorable Paul G. Gardephe
United States District Judge
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

Re: Dominion Capital LLC v. ShiftPixy, Inc., 19-cv-6704 (PGG)

Dear Judge Gardephe:

We are writing on behalf of Dominion Capital LLC ("Dominion") in opposition to Defendant ShiftPixy, Inc. ("ShiftPixy")'s application for a protective order both for previously-produced and to-be-produced discovery. In addition, we are writing to request the Court to order ShiftPixy to produce the previously-promised but not yet provided documents responsive to Dominion's First Request for Production of Documents to ShiftPixy dated August 20, 2019 (the "Document Demand") without further delay.

By way of background, Dominion served a Demand for Production of Documents and Notices to Depose ShiftPixy's Chief Executive Officer Scott Absher and former Chief Financial Office Patrice Launay on August 20, 2019. On August 30, 2019 and September 3, 2019, ShiftPixy produced documents in response to the Document Demand and represented that its production was complete. ShiftPixy made no request for a protective order covering those documents and none would have been appropriate. Dominion then deposed Mr. Absher on September 5, 2019 and Mr. Launay on September 6, 2019, in Irvine, California.

During the course of those depositions, it became clear, and ShiftPixy's counsel agreed, that multiple responsive documents had not been produced pursuant to the Document Demand. Those documents are as follows:

| Scott Absher Deposition Transcript Page Number | Document(s) |
|---|---|
| 51 | Email exchanges between Scott Absher and Patrice Launay regarding these depositions |
| 110; 184 | Accounting memo and drafts thereof prepared for Q3 2018 regarding the Notes |
| 122-23 | Signed Board of Directors resolution or authorization approving the ten million share buyback |
| 239-241 | Scott Absher's notes regarding the conversation in early June 2019 about potentially restructuring the Notes |

Honorable Paul G. Gardephe
September 27, 2019
Page 2

| | |
|---|---|
| 241-242 | Scott Absher's e-mail to the group of noteholders during the initial restructuring conversation |

(The relevant transcript pages are attached hereto as **Exhibit 1**.)

| Patrice Launay Deposition Transcript Page Number | Document(s) |
|---|---|
| 36 | Patrice Launay's emails and versions of documents relating to ShiftPixy's 2019 10-Q filings, as saved on ShiftPixy's systems |
| 45-46 | Email exchanges between Patrice Launay and ShiftPixy's auditors regarding calculations under the Notes |
| 191 | Patrice Launay's worksheet for Dominion Capital and overall summary worksheet |
| 228 | Board of Directors Minutes for any meetings where Patrice Launay spoke about the Notes |

(The relevant transcript pages are attached hereto as **Exhibit 2**.)

Counsel discussed adjourning the depositions pending production of the documents but instead, since counsel had already traveled to California and the witnesses were available, ShiftPixy's counsel agreed to make production immediately following the depositions. We have still not received production. On September 17, 2019, counsel informed us for the first time that production would not be made in the absence of executing a protective order. We immediately objected and demanded production pursuant to ShiftPixy's discovery obligations and counsels' agreement.

We object to ShiftPixy's request for a protective order for the following reasons:

First, ShiftPixy produced documents pursuant to the Document Demand without a protective order and the documents at issue should have been produced at that time.

Second, ShiftPixy has neither identified any documents that warrant a protective order nor articulated any need for a protective order.

Third, ShiftPixy is a public company and ShiftPixy does not have a basis, and certainly has not set forth a basis, to restrict the information from being in the public domain.

Fourth, Dominion should not be placed in the position of being in possession of material, non-public information since it is an investor and ShiftPixy shareholder. Producing the documents pursuant to a protective order could place Dominion into that unacceptable position.

Honorable Paul G. Gardephe
September 27, 2019
Page 3

We respectfully request the Court to deny ShiftPixy's request for a protective order and, instead, to direct ShiftPixy to fulfill its discovery obligations and make immediate production of the above-identified, agreed-to documents.  Alternatively, we respectfully request a hearing at which ShiftPixy be directed to appear and present a particularized basis for seeking a protective order for each of the above-identified documents.

ShiftPixy also requests an extension of time to October 8 to respond to Dominion's Motion for Summary Judgment.  While we remain anxious for an expeditious resolution, Dominion does not object if that is the Court's preference, and we respectfully request the same six days to file a Reply that the Court originally scheduled, and thus until October 14.

Thank you for your attention to this matter.

              Respectfully submitted,

              /s/ Peter R. Ginsberg
              Peter R. Ginsberg
              David E. Danovitch


cc: Martin E. Karlinsky (by ECF)
   John C. Clough (by ECF)

# Exhibit 1

# Scott Absher September 5, 2019 Deposition Transcript Excerpts

Page 50

1   A   We replaced him.
2   Q   Was it a company decision?
3   A   It was.
4   Q   What was the basis for deciding to replace
5   him?
6   A   We felt that he was highly stressed, and he
7   had expressed a desire to quit and move to another --
8   either another position or away from the firm. So he
9   had expressed that. And so we became concerned that we
10  probably ought to look for a replacement and be
11  proactive about it.
12  Q   Did he identify for you any particular issues
13  about the company or the way the company was being
14  managed?
15  A   No, he did not.
16      MR. CLOUGH: Objection to the form.
17  BY MR. GINSBERG:
18  Q   Did he raise any concerns about anything
19  relating to the company finances?
20  A   He did not.
21  Q   Does he have a severance package?
22  A   He does not.
23  Q   He is not receiving any money from ShiftPixy?
24  A   He is not.
25  Q   Have you spoken to him since he left?

Page 51

1   A   We had some email exchanges. I think it was
2   limited to email exchanges.
3   Q   What was the subject matter of the email
4   exchanges?
5   A   This deposition. Somehow I think he construed
6   it as though we were taking action against him, and I
7   tried to explain to him that that was not the case,
8   this was a deposition, it had nothing to do with us, it
9   was just questions he needed to answer.
10  Q   Do you know whether those email exchanges were
11  produced as part of discovery in this case?
12  A   I don't know.
13  Q   Did anyone ask you for your copies of those
14  emails?
15  A   No.
16  Q   Did you provide copies of those emails to
17  anyone?
18  A   No.
19      MR. GINSBERG: I do think those fall within
20  the scope of the demands. We'll deal with that issue.
21  Q   Describe your relationship with Mr. Launay.
22  A   I would say cordial. I would say -- I would
23  say friendly. I still view him in friendly terms. My
24  sense of his exit was I think there was a lot of stress
25  there, and I felt for him. I think he was emotionally

Page 52

1   drained. He was going through the Q, and he was forced
2   to restate some things that he had a disagreement with
3   the auditor on that were not familiar, but they were --
4   they still needed to be restated. I think he felt that
5   that was a reflection on his work, which we didn't
6   believe. I didn't believe it was a reflection on his
7   work. It was a mistake. You fix it and moved on.
8       But he was highly stressed at that period of
9   time. I was empathetic more as a friend that he was
10  really -- he was really stressed and couldn't find a
11  balance, couldn't find a way to shut things down and
12  not work on the weekends. He had a lot of pride in his
13  work and was focused on precision. So I think it
14  stressed -- it put a lot of stress on him.
15  Q   How long had he been with the company?
16  A   I don't know. Over a year. I don't know the
17  exact time but over a year, I believe.
18  Q   Had you worked with him before?
19  A   We had. We had met him when he was part of
20  our prior auditor's audit team. He was there for,
21  like, a two-week period at the very beginning, and then
22  he moved on. But we got to -- we got to watch him
23  interact with our staff and watched -- we tried to
24  understand our business and the moving parts of the
25  business, and we were quite impressed with his

Page 53

1   approach.
2   Q   What's he doing now?
3   A   I don't know.
4   Q   Do you have any plans to communicate with him
5   after your deposition?
6   A   I don't.
7   Q   What were the areas that had to be restated?
8   A   It had something to do with these financial
9   documents. There are all kinds of tricks and traps in
10  these documents, and the auditors caught something. It
11  had to do with volatility. And it's a very complex
12  financial calculation that he missed and was pointed
13  out to him by the auditors, but it was a miss that had
14  happened in the prior quarter. So in doing the more
15  recent quarter, Q3, the auditor said we need to go back
16  and restate Q1. It was an item below the line. It was
17  a small adjustment, not material.
18      But then it slightly delayed our third Q
19  because they wanted to be certain of this. But we had
20  to go back and amend Q2 with this little, subtle change
21  below the line before they could -- and restate that
22  before they could move on because that number had to be
23  moved over to Q3.
24  Q   Who was the auditor?
25  A   Marcum.

Page 110

1  and forced to spend a lot more time in these documents
2  because he had to write an accounting memo for the
3  auditors; and as he was writing the accounting memos,
4  he started uncovering all kinds of things that had to
5  be accounted for, and he realized how complex these
6  things were.
7      Q   What accounting memo are you referring to?
8      A   There was an accounting memo that I believe
9  was in preparation for Q3 regarding the notes.
10     Q   I think that should have been produced as
11 well.  If not, we'll ask for it now, but --
12         MR. FLAGG: We have an ongoing agreement.
13         MR. GINSBERG: Excuse me?  Will you produce
14 that?
15         MR. CLOUGH: To the extent the document
16 exists, we'll certainly adhere to our ongoing
17 responsibilities.
18         MR. GINSBERG: Thank you.
19     Q   Did you believe that Mr. Hoo understood the
20 payment and conversion obligations under the note?
21     A   I don't believe so.
22     Q   Did you believe at the time he did?
23     A   I don't know.
24     Q   Did you ever ask him if he understood it?
25     A   I did not.

Page 111

1      Q   Have you asked him subsequently?
2      A   I have not.
3      Q   Have you asked Mr. Launay subsequently if he
4  had understood the payment and conversion obligations?
5      A   No.
6      Q   Did you believe anyone else on your side of
7  the table understood the payment and conversion
8  obligations?
9      A   No.
10     Q   Did you believe at the time of execution that
11 anyone else on your side of the table understood?
12     A   I had -- my expectation was Mr. Launay had a
13 pretty good mastery of the document.
14     Q   Do you believe, as CEO, that you had an
15 obligation to the shareholders in the company to
16 understand the company's payment and conversion
17 obligations?
18     A   I don't know.
19     Q   Have you had a discussion with anyone
20 regarding that topic?
21     A   No.
22     Q   Is it your testimony sitting here today you
23 still don't understand -- or you still don't know if
24 you had such an obligation?
25         MR. CLOUGH: Object to the form.

Page 112

1          THE WITNESS: I don't know that I had any
2  obligation.
3  BY MR. GINSBERG:
4      Q   Do you believe you did not have an obligation?
5      A   No.
6      Q   You don't know one way or the other?
7      A   I don't know one way or the other.
8      Q   Whether financial or not, was there any kind
9  of analysis or memorandum that set forth the company's
10 payment and conversion obligations under the note
11 before it was executed?
12     A   No.  There was supposed to be an amortization
13 schedule that no one could find for some mysterious
14 reason, and the amortization schedule would have tied
15 everything out.  No one can find it to this date.
16     Q   What efforts have been made to find the
17 amortization schedule?
18     A   I just know that it's been a conversation; but
19 I don't participate in the query, the hunt, or any of
20 that kind of stuff.  So I don't know what its status is
21 or whether or not it's been found.
22     Q   Who has told you that it could not be found?
23     A   In-house counsel.
24     Q   Anyone else?
25     A   I don't know.  I don't know.

Page 113

1      Q   Who did you -- who, to the best of your
2  knowledge, prepared the amortization schedule?
3      A   I don't know.
4      Q   Do you know if one was prepared?
5      A   I do not.
6      Q   What makes you believe one was prepared?
7          MR. CLOUGH: Object to the form.  Assumes
8  facts not in evidence.
9          THE WITNESS: I don't know one way or the
10 other, prepared or not prepared.
11 BY MR. GINSBERG:
12     Q   Has anyone ever told you that one was
13 prepared?
14     A   I don't know.
15     Q   This may be some comfort to you.  I'm going to
16 show you Exhibit 1.
17     A   Oh, good.
18         (Deposition Exhibit 1 was marked for
19         identification by the reporter, a
20         copy of which is attached hereto.)
21         MR. GINSBERG: Should we go off the record for
22 a second?
23         MR. FLAGG: No.
24 BY MR. GINSBERG:
25     Q   Do you recognize Exhibit 1?

Page 122

1  referring to?
2  A  I don't know that there was a written plan
3  created.
4  Q  Who created the plan that you are referring
5  to, whether it was written or not?
6  A  The market created the plan. The market tells
7  you what you can do.
8  Q  Mr. Absher, you just said, for instance, if
9  there was a cap on the buyback of $10 million.
10 A  That was --
11 Q  $10 million or 10 million shares?
12 A  -- 10 million shares.
13 Q  And what are you referring to when you say
14 there's a "cap"?
15 A  10 million shares. The board authorized us to
16 purchase up to 10 million shares. That was their
17 authorization.
18 Q  What else was involved in the board
19 authorization?
20 A  I don't remember what else was in the
21 authorization. Oh, I'm sorry. Duration probably.
22 Yeah, that would have been the other thing, duration.
23 Q  What was the duration?
24 A  I don't remember the specific duration.
25 Q  Was there a start date?

Page 123

1  A  No start date.
2  Q  Is there a specific board authorization or
3  resolution authorizing this plan?
4  A  Yes.
5  Q  Is it a resolution?
6  A  I don't know what the governance name for it
7  would be.
8  Q  Have you seen it?
9  A  I know I had to sign it; but, yeah, I probably
10 have seen it.
11    MR. GINSBERG: Can I get a copy of that as
12 well?
13 Q  When was the board resolution or authorization
14 provided?
15 A  I don't remember the date exactly.
16 Q  Was it before or after Alpha filed its
17 lawsuit?
18 A  After, I believe.
19 Q  Was it before or after Dominion filed its
20 lawsuit?
21 A  I believe before.
22 Q  Have any actions been taken to effectuate this
23 plan?
24 A  No. Because it was a court order, you had to
25 have permission prohibiting that.

Page 124

1  Q  Where was the money going to come from to buy
2  the stock?
3  A  Our operating account.
4  Q  What is the -- what was the plan for what was
5  going to happen to the stock that was being
6  repurchased?
7  A  It would have been retired to the treasury.
8  Q  And what financial analysis was prepared to
9  determine whether that plan was beneficial to the
10 viability of the company?
11 A  None.
12 Q  Who made the recommendation to create this
13 plan?
14 A  I don't remember.
15 Q  There was no financial analysis prepared. Was
16 there any kind of analysis prepared?
17 A  No.
18 Q  What was your understanding of why such a plan
19 would have been good for the company?
20 A  The feedback from people that were more
21 familiar with the investor relations side of these
22 types of issues said that it would be a good thing.
23 The stock price was hammered down to, like, the $.50
24 level. So the opportunity to retire cheap shares just
25 seemed like not a bad thing to do under the

Page 125

1  circumstances. Also -- you don't want this -- we
2  thought if we could bring the stock back up to a level
3  that would be helpful to the noteholders would be not a
4  bad idea also so that we could resume redemptions.
5  Q  When you say "the feedback from people," who
6  are the people you are referring to?
7  A  Just like our investor relations firm out of
8  New York. We mentioned that we were contemplating
9  this. We'd also talked to a couple of investment
10 banks, broker dealers, and said we were contemplating
11 this. We didn't know much about these types of things.
12 Q  What's the name of your IR firm?
13 A  ICR.
14 Q  How long have you used them?
15 A  For two years, I believe.
16 Q  Do you deal directly with anyone from ICR?
17 A  Yes.
18 Q  With whom?
19 A  Vance Edelson and Brad Cohen.
20 Q  And who are the investment managers or
21 investment brokers that you say you also --
22 A  We had Benchmark. We talked to --
23 Jason Diamond had subsequently moved from Drexel to
24 start on securities. So we talked to them about the
25 mechanics and viability of a buyback.

Page 182

1  using the calculation that is set forth in the "Notice
2  of Conversion"; correct?
3      MR. CLOUGH: Object to the form. Calls for
4  speculation.
5      THE WITNESS: I mean, if you are asking if the
6  math extrapolates that, does it line up with the
7  issuance instruction form, it does.
8  BY MR. GINSBERG:
9   Q  And is it your understanding that your company
10 had an obligation to review the calculation before
11 issuing -- before executing the issuance instruction
12 form?
13     MR. CLOUGH: Object to the form. Calls for a
14 legal conclusion.
15     THE WITNESS: I would agree that we would have
16 had to somewhere along the line review this to confirm
17 it or amend it.
18 BY MR. GINSBERG:
19  Q  As a matter of fact, your company -- your
20 offices of your company had an obligation to your
21 shareholders and to the company to assure that the
22 right number of shares were being issued; correct?
23     MR. CLOUGH: Object to the form. Calls for a
24 legal conclusion.
25     THE WITNESS: The problem is that we were --

Page 183

1  there was a conversation somewhere earlier on where
2  nobody attested or protested a conversion request.
3  They are coming in at such a fast pace by all of the
4  firms that they were, I think, just moving them along.
5  I don't think they were being questioned early on.
6  BY MR. GINSBERG:
7   Q  So is it your testimony that the officers of
8  your company were not fulfilling their obligation to
9  assure the accuracy?
10  A  I think they were --
11     MR. CLOUGH: Object to the form. Assumes
12 facts not in evidence. Mischaracterizes testimony.
13     THE WITNESS: Okay. Any other question? They
14 were -- I think the answer is they were trying to honor
15 the demands of the noteholders.
16 BY MR. GINSBERG:
17  Q  Were they trying to honor their obligations to
18 the shareholders and to the company as well?
19  A  Both. Both, yes.
20  Q  And when do you believe for the first time
21 that anyone suggested that maybe the calculation was
22 not correct?
23  A  I think when Patrice got into the accounting
24 memo.
25  Q  After the lawsuits were filed?

Page 184

1   A  No. The accounting memo would have -- it
2  would appear around the same time as Alpha. It could
3  have been. It coincided with that third-quarter audit
4  where he had to put together the accounting memo. So
5  it was probably right before or right around the time
6  we had to really get into the accounting implication of
7  these instruments.
8      MR. GINSBERG: Can you try to get me that memo
9  before Patrice's deposition tomorrow so I don't have to
10 come back here for a second day?
11     MR. CLOUGH: We will endeavor to locate all
12 documents responsive to your request for production.
13     MR. GINSBERG: I certainly appreciate that.
14  Q  Do you recall anyone questioning the
15 calculation before an issuance form was executed?
16  A  I remember conversations questioning some of
17 those calculations.
18  Q  Before the issuance form of Exhibit 9?
19  A  Yeah. I would think that there was a question
20 along the way. I don't see the specifics on some of
21 these transactions. The earlier ones, I believe, were
22 pretty straightforward. Where it started to get a
23 little dicey was after the stock price started
24 dropping. The calculations were in question just
25 because they were different for each one of the

Page 185

1  noteholders.
2   Q  When do you believe that those conversations
3  began?
4   A  I don't recall exactly.
5   Q  Who was involved in those conversations?
6   A  It would have been Patrice and Mark.
7   Q  So they had internal conversations?
8   A  Yeah, I believe so; or in some cases, they may
9  have pushed back via email, asking them to
10 double-check. And I know there were occasions where --
11 I don't know if it was specific to Dominion, but some
12 of the funds would -- they would go back -- there would
13 be some shuttle conversation, and some of the funds
14 would say "Yeah, I see. Yeah, I know. You are right.
15 That is the wrong calculation."
16  Q  Do you recall seeing any emails with Dominion
17 along the lines of what you just described?
18  A  I believe so. I believe so.
19  Q  From when?
20  A  I don't know what the period would have been.
21  Q  How were those issues resolved?
22  A  Very quickly and amicably. I think there was
23 an agreement that "Yeah, you are right. That is the
24 calculation." It wasn't a -- it wasn't contentious at
25 all.

Page 238

1  Mr. Diamond after receiving the amortization payment?
2  A  Probably in this time frame when this
3  conversation was percolating.
4  Q  Did you call him?
5  A  Yes.
6  Q  Do you have any notes of that conversation?
7  A  I don't.
8  Q  What did Mr. Diamond say when you told him you
9  were not going to honor the cash request?
10 A  He didn't really respond to that.
11 Q  Did you discuss with him whether you had any
12 basis to reject the request?
13 A  No.
14 Q  Did he give you an opinion as to whether you
15 had a basis to reject the request?
16 A  No.
17 Q  Did you tell him any basis that you had for
18 rejecting the request?
19 A  No.
20 Q  Did you seek counsel from anybody about
21 whether you had a basis for rejecting the request?
22 A  No.
23 Q  Did you give an explanation to anyone at
24 Dominion about why you were rejecting the request?
25 A  When you follow the chronology, Mike is asking

Page 239

1  about -- about talking about the payment. I said that
2  will be a part of our conversation. The setup there
3  was we are going to talk about how we are going to
4  revisit the notes and how we'd like to restructure
5  things.
6     MR. GINSBERG: Could you repeat my question,
7  please.
8     (The record was read as follows: "Did
9     you give an explanation to anyone at
10    Dominion about why you were rejecting
11    the request?")
12    THE WITNESS: Eventually, yes.
13 BY MR. GINSBERG:
14 Q  When?
15 A  Subsequent to this, when Mike and I finally
16 talked.
17 Q  When did you and Mr. -- when did you and he
18 speak?
19 A  It would have been -- based on this
20 chronology, it would have been after 6-5. Let's see.
21 Yeah, it would have been after 6-5, sometime after
22 June 5th, so presumably June 6th or 7th, something like
23 that.
24 Q  Do you recall having a conversation with him?
25 A  I do.

Page 240

1  Q  Tell me about that conversation.
2  A  I told him that we are in a place that none of
3  us planned to be. The bankers put us in this place. I
4  wanted to get together with everybody, and I wanted to
5  talk about restructuring the notes.
6  Q  And what was his response?
7  A  He was amicable to that.
8  Q  So what happened?
9  A  We had the conversations with each of the
10 funds individually, and everybody was amenable to
11 coming up with a resolution, and then we brought
12 everybody together on a group conference call.
13 Lynne Bolduc was kind of taking notes on the
14 conversation so that she could summarize the request
15 that we were making; and we had some just slight banter
16 back and forth about what would work for each of the
17 funds and what wouldn't. And so we kind of got some
18 ideas in principle about what to come back to them
19 with, which we did about 30 minutes after the group
20 conversation. We circulated back to everyone with a
21 "Here's our request, and we are waiting feedback."
22 Q  Did you -- I'm sorry. I didn't understand
23 that. Here's our request from what?
24 A  The restructuring standpoint. "Here's what
25 we'd like to request."

Page 241

1  Q  Do you have any notes of the conversation or
2  notes of what you proposed?
3  A  I do.
4  Q  Where are those notes?
5  A  They might be in your discovery, but they were
6  part of our package.
7     MR. GINSBERG: I'm not aware of any notes
8  having been produced.
9     MR. CLOUGH: We will review what we have
10 produced, and to the extent that we need to supplement,
11 we will respond to your request for production.
12 BY MR. GINSBERG:
13 Q  How extensive are the notes?
14 A  It was a summary of the conversation. I think
15 there were four primary deal points and then some
16 subsequent conversation. It was circulated to all of
17 the noteholders at the same time via email and awaiting
18 their feedback.
19 Q  You said there was also an email that you
20 sent?
21 A  Yes, right immediately following the group
22 conversation, the group conference call. We --
23 Lynne Bolduc was present, again, just to record the
24 talking points and then distribute them back to all the
25 noteholders.

Page 242

1   MR. GINSBERG: Would you put that on your list
2   as well.
3         THE WITNESS: It's the --
4         MR. FLAGG: It's a letter; right?
5         THE WITNESS: No. It's an email that Lynne
6   sent out to the group, the entire group.
7         MR. CLOUGH: Which would have been inclusive
8   of counsel's client?
9         THE WITNESS: Correct.
10        MR. GINSBERG: Inclusive of what?
11        MR. CLOUGH: Your client.
12        THE WITNESS: Yeah, Dominion would have been a
13  party to that.
14        MR. GINSBERG: We are not aware of any such
15  email.
16        THE WITNESS: It exists.
17        MR. GINSBERG: Maybe you guys can get it
18  before tomorrow.
19        THE WITNESS: Yeah. Yeah.
20        MR. GINSBERG: Do you guys need a break?
21        MR. CLOUGH: No.
22  BY MR. GINSBERG:
23   Q   The June '19 -- 2019 payment was never made;
24  correct?
25   A   The June what?

Page 243

1    Q   The June 2019 payment was never made; correct?
2    A   It was not made.
3         MR. GINSBERG: Let's identify as Exhibit --
4   I'm sorry -- as Exhibit 5 a two-page document
5   Bates-stamped ShiftPixy-851 and 852.
6         (Deposition Exhibit 5 was marked for
7          identification by the reporter, a copy
8          of which is attached hereto.)
9         MR. CLOUGH: Counsel, can we go off the record
10  for one second?
11        MR. GINSBERG: Sure.
12        (Off the record.)
13  BY MR. GINSBERG:
14   Q   Mr. Absher. Let me go back for a second. You
15  testified that you had taken notes about the
16  conversation you had with the noteholders subsequent to
17  the June amortization request and that there was then a
18  follow-up email; correct?
19   A   That's correct.
20   Q   And I want to make sure I understand both of
21  those documents. With regard to the notes, are those
22  handwritten notes of yours?
23   A   No. They were -- they were emails. It was an
24  email summary from Lynne Bolduc to all the noteholders
25  summarizing the conversation.

Page 244

1    Q   That's the second document, but I think you
2   said --
3    A   No. There's no second document.
4    Q   Oh. Thank you. I thought you said that you
5   had taken notes and then there was a subsequent email.
6    A   No, no. Lynne Bolduc took the notes based on
7   the conversation. We had a preliminary kind of list
8   for her about what it was we were going to ask so she
9   had an idea of what was going to be requested; and then
10  she summarized the conversation, including feedback or
11  requests back the other way from the investor group.
12   Q   And did she take contemporaneous notes during
13  those conversations?
14   A   She did.
15   Q   And then memorialized the notes in email to
16  the participants?
17   A   Yeah. Summarized the talking points, yes.
18        MR. GINSBERG: And I assume you won't produce
19  the attorney's notes. Good assumption?
20        MR. CLOUGH: That would be a fair assumption.
21  BY MR. GINSBERG:
22   Q   But the email --
23   A   Yes.
24   Q   I appreciate that. I didn't understand.
25        MR. GINSBERG: What was this one marked as?

Page 245

1         THE REPORTER: Five.
2   BY MR. GINSBERG:
3    Q   Do you recognize Exhibit 5?
4    A   I don't.
5    Q   This appears to be a November 2, 2018,
6   amortization payment request of $16,166.66 of interest
7   and $227,272.73 of payments under the senior secured
8   note. Do you see that?
9    A   I do see that.
10   Q   And there's, attached to that as "Exhibit A,"
11  an amortization schedule; correct?
12   A   That's correct. Just an "Exhibit A." It
13  appears to be an amortization schedule.
14   Q   The communication from Mr. Manuel references
15  that schedule to show that, in fact, the payment was
16  due and owing; correct?
17   A   I don't know.
18   Q   That's what the letter says?
19   A   That's what the letter says.
20   Q   And the last sentence says "If you'd rather
21  give us stock than cash payment, please advise Dominion
22  of that"; correct?
23        MR. CLOUGH: Objection. The document speaks
24  for itself.
25        THE WITNESS: Yeah. If it's -- "In the event

# Exhibit 2

# Patrice Launay September 6, 2019 Deposition Transcript Excerpts

Case 1:19-cv-06704-PGG   Document 31   Filed 09/27/19   Page 12 of 16

| DOMINION CAPITAL LLC -against- vs. SHIFTPIXY, INC. | PATRICE LAUNAY September 6, 2019 |

Page 34

1  A   Verbal communication with Sherman of the audit
2  committee, verbal discussion with the company CEO, and
3  verbal communication with an SEC consultant.
4  Q   What was Mr. Sherman's reaction when you told
5  him about this issue?
6  A   I don't recall specifics.
7  Q   Was he upset?
8  A   Disappointed.
9  Q   When you draft a 10-Q as you've just
10 described, do you do it on a computer?
11 A   Do I -- I'm sorry.
12 Q   Do you do it on a computer?
13 A   Correct.
14 Q   And when you make revisions to the 10-Q, do
15 you do a redline copy of the 10-Q with revisions?
16 A   Correct.
17 Q   And you save that on your computer as well?
18 A   Correct.
19 Q   And then you circulate the redlined version to
20 the people who received the draft in the first
21 instance; is that correct?
22 A   Correct.
23 Q   And then you receive back comments from those
24 people to the redlined version; is that right?
25 A   Correct.

Page 35

1  Q   And are those comments generally redlined also
2  from the people who send back the comments?
3  A   Many different auditors.  And I would say no.
4  It's notes on the document as opposed to a redline from
5  auditors.
6  Q   When the auditors send you back those
7  comments, are those sent to you by email?
8  A   Yes.
9  Q   And do you save those auditors' comments in
10 your system?
11 A   Yes.  Maybe not all of them.
12 Q   And then, after you receive the auditors'
13 comments, do you do another version of the 10-Q?
14 A   Yes.
15 Q   And is that version saved on your computer as
16 well?
17 A   Yes.
18 Q   Then do you circulate this new version to all
19 the people that you've identified?
20 A   Yes.
21 Q   And they return comments to you?
22 A   Yes.
23 Q   And you save those comments as well?
24 A   No.
25 Q   Why not?

Page 36

1  A   Some are in emails.  I may have the emails,
2  or I don't know.
3  Q   In the instance that we are talking about
4  regarding the change in Exhibit 23, did you receive
5  comments at that stage by email, or were there comments
6  or revisions of this additional draft of the document?
7  A   I don't remember.
8  Q   And then what happens?  Do you ultimately
9  finalize the document?
10 A   I incorporate all edits and submit it to the
11 auditors.
12 Q   And did you do that in this instance?
13 A   Yes.
14 Q   And how do you submit it to the auditors?  By
15 email?
16 A   Yes.
17 Q   And all of those emails and versions of the
18 document are retained on the computer system; correct?
19 A   On my email inbox, yes.
20     MR. GINSBERG: I'd ask that all of those
21 communications and versions of this document be
22 produced.
23     MR. CLOUGH: We will review the documents in
24 our possession, and to the extent that we need to
25 supplement our response to the request for production,

Page 37

1  we will do so.
2     MR. GINSBERG: I appreciate that.
3  Q   The extension was for five days; correct??
4  A   I believe, yes.
5  Q   And does that mean that Exhibit 23 was
6  finalized and filed on or about July 20th?
7  A   I would assume so, yes.
8  Q   And within ten days of that event, you
9  resigned; is that right?
10 A   Correct.
11 Q   To whom did you first tell you were resigning?
12 A   To the chief executive officer and to the
13 cofounder, Steve Holmes.
14 Q   Did you tell them together or independently?
15 A   Independently.
16 Q   What was Mr. Absher's response when you told
17 him you were resigning?
18 A   "Everybody makes mistakes."
19 Q   Did you discuss specifically the revision in
20 Exhibit 23 with Mr. Absher in the conversation when you
21 told him that you were resigning?
22 A   In the same conversation?
23 Q   Yes.
24 A   No.
25 Q   Why did you tell him you were resigning?

Page 42

1  A   Regarding the conversion? Which specific --
2  Q   The first issue we've been discussing.
3     MR. CLOUGH: Object to the form.
4  BY MR. GINSBERG:
5  Q   I'm asking you about the first issue. Did the
6  auditor ever provide to you any support, calculation,
7  analysis, or work papers in writing regarding that
8  issue?
9     MR. CLOUGH: Same objection.
10    THE WITNESS: I believe I was provided with a
11 guidance. I looked at the guidance, calculated the
12 impact, submitted it to auditors. Auditors reviewed.
13 Auditors approved.
14 BY MR. GINSBERG:
15 Q   My understanding from your earlier testimony
16 was the guidance was guidance as to how to recalculate
17 if such an error were made; correct?
18 A   No. What I just mentioned was how to
19 calculate the impact of granting more shares than what
20 the legal documents apparently state.
21 Q   My question to you was whether any kind of
22 writing was ever provided to you to support the
23 proposition that you, in fact, had improperly
24 calculated.
25 A   Yes. There was probably one extract of a

Page 43

1  guidance.
2  Q   What did the guidance address? Whether you
3  had made the calculation correctly or how the
4  modification should be made if the calculation were
5  incorrect?
6  A   The extract provided -- stated the definition
7  of "inducement," which means that the company provides
8  more shares than what a legal document states, and
9  secondly, the document states how the loss is
10 calculated.
11 Q   And my question to you, sir, is did anyone
12 ever provide to you any written support of the finding
13 that, in fact, there was that inducement or that more
14 shares were issued than should have been issued?
15 A   That's the document received from the
16 auditors, yes.
17 Q   And that explained to you the error that had
18 been made in calculating the number of shares that
19 should have been issued?
20 A   Yes.
21 Q   Maybe I misunderstood your earlier testimony.
22 I thought you had said that the auditors provided to
23 you guidance regarding how to recalculate but had not
24 provided to you support for the conclusion that you
25 had, in fact, inaccurately calculated.

Page 44

1  A   The documentation provided by the auditors
2  described an inducement loss, described the scenario,
3  and they concluded that this -- that since we were
4  giving more shares than the document, hence we were in
5  a situation of an inducement loss.
6     So, to your question, they provided a
7  description of what is an inducement loss from their
8  own internal discussion.
9  Q   And what I'm asking you is very specific.
10    Did anyone ever provide to you any written
11 support for the conclusion that, in fact, the company
12 had issued more shares than it should have issued?
13 A   Accounting support or legal support?
14 Q   Either.
15 A   Accounting support, yes.
16 Q   What was the accounting support that showed
17 that you had, in fact, made an improper calculation?
18 A   An extract of a U.S. GAAP.
19 Q   Which stated what?
20 A   I'm sorry?
21 Q   Which stated what?
22 A   When a company grants more shares than what a
23 legal document states, it has to recognize an
24 inducement loss.
25 Q   Okay. But my question to you is was there any

Page 45

1  written support for the proposition that you, in
2  fact -- that ShiftPixy, in fact, had issued more shares
3  than it was obligated to issue based upon the wording
4  of the note?
5  A   Except what --
6     MR. CLOUGH: Objection. Calls for a legal
7  conclusion.
8     THE WITNESS: What I just said, no.
9  BY MR. GINSBERG:
10 Q   No?
11 A   Except the document I just mentioned, no.
12 Q   Did that document make specific references to
13 any provisions of the note?
14 A   No.
15 Q   Did it provide any language from the note
16 regarding how the calculation was to be made?
17 A   Yes.
18 Q   It quoted from the note?
19 A   Through email with auditors, yes, and verbal
20 communication, yes.
21 Q   Tell me about the email from the auditors that
22 quoted from the note regarding how the calculation
23 should have been made.
24 A   The auditors refer to a specific note from the
25 debenture.

Page 46

1   Q   The debenture involving Dominion?
2   A   Involving all investors.
3   Q   And you recall specifically that
4   communication?
5   A   Yes.
6   Q   And it's your belief that such a communication
7   exists?
8   A   There are emails, and there were verbal
9   communications.
10  Q   I'm asking you about the emails now.
11  A   Yes, I have emails.
12  Q   And are those emails on the company's system?
13  A   I don't know.
14  Q   Do you keep them in the company's system?
15  A   I did not delete my emails.
16  Q   Excuse me?
17  A   I did not delete my emails.
18  Q   I think I've already asked for this, but if
19  these emails exist --
20      MR. CLOUGH: Again, we will review our
21  records, and to the extent that we need to supplement
22  our response from the request for production, we will
23  do so.
24      MR. GINSBERG: Thank you.
25  Q   And, again, you didn't take any notes of these

Page 47

1   conversations?
2   A   No.
3       MR. GINSBERG: We've been going about an hour.
4   Why don't we take about a ten-minute break.
5       THE WITNESS: Okay.
6       MR. GINSBERG: Thank you.
7       (Off the record.)
8   BY MR. GINSBERG:
9   Q   Sir, how many shares do you believe Dominion
10  received under the conversion notices that it should
11  not have received?
12  A   I don't remember the exact -- the exact
13  number.
14  Q   Did you ever calculate that number?
15  A   Yeah, I calculated it.  I provided a
16  calculation to auditors.
17  Q   To the auditors?
18  A   Yes.
19  Q   Specifically with regard to Dominion?
20  A   Yes.
21  Q   Did you make that communication in writing?
22  A   Yes.
23  Q   By email?
24  A   Yes.
25  Q   Do you recall approximately how many shares?

Page 48

1   A   No.
2   Q   Let's use a range.
3   A   I don't know.
4   Q   Was it between zero and a hundred?
5   A   No.
6   Q   Was it between one and two hundred?
7   A   I don't remember the principal converted by --
8   it depends on the principal converted by Dominion, and
9   it depends on the price at which they converted.  So I
10  don't remember.
11  Q   You have no recollection?
12  A   No.
13  Q   You can't give me any range?
14  A   No.
15  Q   Did you ever do a calculation of value of the
16  shares based on the current stock price or the stock
17  price at the time this issue arose?
18  A   The calculation was based on the difference
19  between the -- I believe the 249 initial conversion
20  price and the conversion price at which the investors
21  converted their principal on each day.
22  Q   And you provided such a spreadsheet to the
23  auditors?  Is that your testimony?
24  A   That's correct.
25  Q   Did you provide notice, or do you know if the

Page 49

1   company provided notice to Dominion that it had
2   received shares that it supposedly should not have
3   received?
4   A   I am not aware.
5   Q   You didn't provide any such notice?
6   A   Me personally?
7   Q   Yes, sir.
8   A   No.
9   Q   And you didn't see any such notice?
10  A   No.
11  Q   Did anyone ever tell you that that notice was
12  provided to Dominion?
13  A   What do you -- can you please define "notice."
14  Q   Did anyone ever tell you that Dominion had
15  been notified that it received shares it should not
16  have received?
17  A   No.
18  Q   Did you discuss with anyone whether Dominion
19  should be put on notice of this situation?
20  A   Yes.
21  Q   Who did you discuss that with?
22  A   My direct supervisor, CEO.
23  Q   Mr. Absher?
24  A   Correct.
25  Q   Tell me about that discussion.

Page 190

1  and 13.
2     MR. GINSBERG: I bet you could.
3     MR. FLAGG: You give me too much credit,
4  Counsel.
5     (Deposition Exhibits 12 and 13 were
6     previously marked for identification,
7     copies of which are attached hereto.)
8  BY MR. GINSBERG:
9  Q   Exhibit 13 is a "Notice of Conversion" dated
10 3-14-2019.
11 A   Uh-huh. Yes.
12 Q   And that sought the issuance of 519,771
13 dollars -- correct? -- shares. I'm sorry.
14 A   373,536. Correct.
15 Q   So the number of shares is 519,771 on the
16 "Notice of Conversion." Is that not correct?
17     MR. CLOUGH: You are asking about Exhibit 13?
18     MR. GINSBERG: Yes.
19     THE WITNESS: Oh, yes, that's correct.
20 BY MR. GINSBERG:
21 Q   And then, if you look at Exhibit 12, that
22 reflects that shares totaling 373,536 were being
23 issued; correct?
24 A   That's correct.
25 Q   Was there a determination that the calculation

Page 191

1  set forth in Exhibit 13 was somehow inaccurate?
2  A   I don't remember a specific -- I don't
3  remember why the calculation was different from the
4  "Notice of Conversion" and the instruction.
5  Q   Do you know whether -- do you recall whether
6  you identified a mistaken calculation at this point?
7  A   Well, I must have -- I must have had a
8  document somewhere, the difference between the
9  conversion and the instruction notice, but I don't
10 remember the specific.
11 Q   What kind of document would reflect that?
12 A   My worksheet.
13 Q   Do you have a worksheet for each "Notice of
14 Conversion"?
15 A   No. I have a worksheet for each investor and
16 a summary worksheet.
17     MR. GINSBERG: I don't think that's been
18 produced to us either.
19 Q   Can you describe in more detail what your
20 worksheet for Dominion --
21 A   It's the same as any other investors. I have
22 each tab for each investor listing every time there's a
23 conversion, the date, the principal, and the conversion
24 price, the interest converted, cash payment and
25 principal remaining, and make whole for each investor

Page 192

1  and then a summary sheet where I break all information
2  for each and every time.
3  Q   Is that different than Exhibit 4?
4  A   It's assumed to be from the same worksheet.
5  Q   Did you prepare that worksheet up until the
6  time you left the company?
7  A   Yes.
8  Q   Is that -- Exhibit 4 seems to have ended at
9  some point before your -- while you were still working
10 at the company.
11 A   So if this conversion was done on 3-14, I
12 should have an explanation for the difference between
13 those two numbers.
14 Q   Let me show you Exhibit 4 again. We'll
15 just --
16 A   No. I know where it is. I have it.
17 Q   Does that have the information you just
18 identified?
19 A   Yes, sir.
20 Q   That shows the difference in calculation?
21 A   Yes, sir.
22 Q   Okay. Perhaps you can help me decipher.
23 Where -- can you identify for me where the difference
24 in the calculations are?
25 A   Well, there might be a comment on a sale. So

Page 193

1  when you print that document, it won't appear. So it's
2  not like there is a tick mark and a tick-mark reference
3  with an explanation of the bill on the document.
4  Q   I don't see any entry for March 15th, 2019.
5  A   Well, I don't know where this is coming from.
6  So this appendix -- Exhibit 4 -- I'm sorry -- is it for
7  Dominion?
8  Q   It was produced to us as part of this
9  litigation. I think it was the only spreadsheet that
10 was produced to us.
11 A   Yeah. But there is different tabs for each
12 investor. So if you don't see -- okay. Well, it looks
13 like the same.
14 Q   Yeah. It looks like it is for Dominion. At
15 least it matches up somewhat, but the transaction we
16 were just talking about does not appear on this
17 spreadsheet, and there's no, as far as I can tell --
18 A   Then maybe that's not the -- I don't know
19 where this was taken from.
20 Q   But you will agree with me that the
21 transaction we were just talking about does not appear
22 on this spreadsheet; correct?
23 A   Yeah. Obviously, you don't see those numbers.
24     MR. GINSBERG: Maybe you all can go back and
25 see if you can find the right spreadsheet.

Page 226

 1  Q   What decision?
 2  A   Of not honoring further conversion.
 3  Q   Who was the member you recall --
 4  A   Mr. White.  Sorry.
 5  Q   You've been very good today.
 6      You recall Mr. White --
 7  A   Yes.
 8  Q   -- specifically approving the decision not to
 9  honor the company's legal obligations; is that your
10  testimony?
11  A   Correct.
12      MR. CLOUGH: Object to the form.  Calls for
13  speculation.
14  BY MR. GINSBERG:
15  Q   Were you --
16      MR. CLOUGH: I'm fixing my form objection.
17  Go ahead.  I hear it.  Go ahead.
18  BY MR. GINSBERG:
19  Q   Do you recall what words specifically
20  Mr. White used?
21      MR. CLOUGH: You can answer.
22      THE WITNESS: No.
23  BY MR. GINSBERG:
24  Q   Was there any discussion about the issue that
25  you had raised in the early part of your deposition

Page 227

 1  today about whether the number of shares that had been
 2  issued pursuant to the conversion notices had been
 3  incorrectly calculated?
 4  A   **They were no form of communication, but they**
 5  **were ongoing discussions with the chairman of the**
 6  **board of the audit committee, Mr. Ken Weaver.**
 7  Q   Tell me about those communications.
 8      MR. CLOUGH: Communications that counsel is
 9  asking you to draw upon, who was present, but was there
10  anyone else present besides you and Mr. Weaver?
11      THE WITNESS: No, there was nobody outside.
12  BY MR. GINSBERG:
13  Q   Tell me about those conversations.
14  A   **Regular ongoing business, financial matrix**
15  **where the business was going, profitability,**
16  **break-even.**
17  Q   Tell me about the conversation with regard to
18  the calculation of the conversion notice and the
19  conversions.
20  A   **Well, it happened, I believe -- I recall**
21  **around the year-end audit when I had to draft the**
22  **accounting memo we were discussing earlier.**
23  Q   You remember conversations with the head of
24  the audit committee in that conversation?
25  A   **Yes, I mentioned this.**

Page 228

 1  Q   And what was his reaction to that?
 2  A   I don't recall.
 3  Q   Did -- to the best of your knowledge, did the
 4  head of the audit committee ever disclose to the board
 5  that you had determined that the conversion
 6  calculations that had been used were incorrect?
 7      MR. CLOUGH: Objection.  Calls for
 8  speculation.
 9      THE WITNESS: I don't know specifically if he
10  had.  I must have disclosed this in the minutes
11  following the -- or leading to the 10-K.  This must
12  have been -- I must have brought that in in the audit
13  committee -- not audit committee -- board of directors
14  meeting.
15  BY MR. GINSBERG:
16  Q   Do you recall telling the board of your
17  determination?
18  A   **I do not recall specifically, but I'm pretty**
19  **confident this must have been disclosed.**
20      MR. GINSBERG: Can you put that on your list
21  of items to produce if there are any board minutes that
22  reflect what the witness has just testified to?
23      MR. FLAGG: If there are any.
24      MR. CLOUGH: Again, we will review the company
25  records, and to the extent that we need to supplement

Page 229

 1  our responses to the requests for production, we will
 2  in accordance with the Federal Rules of Procedure.
 3  BY MR. GINSBERG:
 4  Q   Do you recall the board discussing what
 5  measures, if any, should be taken as a result of what
 6  you told them was a miscalculation of the conversions?
 7      MR. CLOUGH: Object to the form.
 8      THE WITNESS: No.  What I told them was that
 9  was a difference of interpretation between the auditors
10  and my interpretation of what the document states, and
11  by "document," I mean the June 2018 debenture.
12  BY MR. GINSBERG:
13  Q   Did you tell the board that the auditors
14  believed that the conversions were properly calculated
15  and that you disagreed with that?
16  A   **Not in the conversion.  At the time, it was**
17  **the accounting implication of such disconnect and**
18  **interpretation.**
19  Q   Did you ever tell anyone --
20      Did you ever tell the board that you believed
21  that the actual method of calculation was incorrect?
22  A   **That I must have tell -- I must have told the**
23  **board that I believe the -- my interpretation was that**
24  **the conversion was -- should be at a 15 percent**
25  **discount to VWAP -- but the document states**