UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| DOMINION CAPITAL LLC, | : | |
| | | 19 Civ. 6704 (PGG) |
| Plaintiff, | : | |
| | | **DECLARATION OF SCOTT W.** |
| - against - | : | **ABSHER IN OPPOSITION TO** |
| | | **PLAINTIFF'S MOTION FOR** |
| SHIFTPIXY, INC., | : | **SUMMARY JUDGMENT** |
| | | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SCOTT W. ABSHER submits the following declaration, under penalty of perjury pursuant to 28 U.S.C. § 1746.

1. I am the chief executive officer of ShiftPixy, Inc. ("ShiftPixy"), defendant and counter-plaintiff in the above-captioned action. I submit this declaration in opposition to the motion for summary judgement of Dominion Capital LLC ("Dominion"), plaintiff in this action. I have personal knowledge of the facts recited here.

2. ShiftPixy is a Wyoming corporation with its principal place of business in Irvine, California. It is an early stage technology-based specialized staffing and human capital management service provider that offers solutions for large contingent part-time workforce demands, primarily in the restaurant, hospitality, and maintenance service trades. ShiftPixy was a privately held company until 2017, when it made an initial public offering of its shares of common stock at $6 per share. The stock was and is listed on the NASDAQ capital markets exchange. Until roughly a year ago, ShiftPixy's stock continued to trade near its initial offer price; its 52-week high over the last year was $5.37. Its share price has since declined substantially and has most recently been trading at roughly 50 cents per share.

3. In June 2018 and in March 2019, ShiftPixy sold senior secured convertible notes to five (5) investors, including Dominion (collectively the "Notes," and individually the "June 2018 Note" and the "March 2019 Note.") (*See* Exhibits A and B, respectively)  The other investors are Alpha Capital Anstalt; CVI Investments, Inc.; MEF I, L.P.; and Osher Capital Partners, LLC.  The investors also received a December 2018 note (the "December 2018 Note"), with terms identical to the June 2018 Note, to cure a technical default under that Note.  The Notes are convertible into common shares of ShiftPixy at prices calculated as a substantial discount to the shares' market price.

4. The economic terms of the Notes were highly favorable to the noteholders. The June 2018 Notes were sold at a discount of 10% to the principal amount of the Notes and also bore a favorable interest rate of 8%.  The March 2019 Notes were sold at a discount exceeding 20% to the principal amount of the Notes.  (Dominion paid $500,000 for a note with a face value of $633,333.33.)  The March 2019 Note did not bear interest, but at maturity required payment of 110% of outstanding principal and accrued interest.

5. The Notes as a whole are what is commonly called "toxic" financing. Under the Notes, the noteholders, including Dominion, converted principal to ShiftPixy shares at a substantial discount to the market price of the stock.  For example, under the June 2018 Note conversions occurred at a 15% discount to a 10-day VWAP (that is, the volume-weighted average price of the stock over the 10 days preceding the conversion demand).  The noteholders, including Dominion, then sold converted shares as soon as volume was robust enough to absorb the sales.  Taken together with the discounted initial price and the interest component, the noteholders were able to realize returns on investment that exceeded 30%.

6. ShiftPixy honored a series of conversion demands from Dominion and the other noteholders under the Notes until June 2019. Each of the noteholders including Dominion apparently immediately sold its converted shares in the open market. In the spring of 2019, short interest in the stock increased markedly, apparently caused or affected by the noteholders' wholesale bailing themselves out of their conversion stock positions. The conversions and immediate sales of converted stock raised the possibility that ShiftPixy's stock would enter a "death spiral," which threatened to erode stockholder value and make it extremely difficult in future to obtain needed financing.

7. The effect of the issuance and sale of the conversion shares because of selling pressure created by the additional stock flooding the market was to depress the market price of ShiftPixy's shares. From a high of roughly $5.37 in July 2018, that price declined to below $.50 by July 2019. In part because ShiftPixy stopped honoring conversion demands in June 2019, it has since rebounded, recovering from a low of $0.376 as of June 12, 2019 to $0.67 as of July 16, 2019 and climbing to a high as $0.733 on July 12, 2019. (The stock closed at $0.45 on Friday, October 4, 2019.)

8. There does not appear to be a good explanation for the earlier decline outside of the noteholders' activities and the selling pressure created by those activities. ShiftPixy has issued a series of reports reflecting a solid business and good operating results, an increasing level of revenues, and declining losses, and to the extent that it has reported news that might be concerning to investors, that news was counterbalanced by its current operations and good future prospects.

9. On June 6, 2019, after ShiftPixy's share price had declined to and remained below $1.00, its principal exchange and regulator, the NASDAQ, issued ShiftPixy a

de-listing notice. The notice indicated that if ShiftPixy's share price and other listing requirements had not been satisfied by December 3, 2019, ShiftPixy's shares would be de-listed.[1] This was of serious concern to ShiftPixy. It owed fiduciary duties to its shareholders to maintain its listing and a robust public market for its securities. (It owed contractual duties to its noteholders, including Dominion of course, but the declining share price suggested that further conversion demands would destroy the market for its stock completely. In fact, continued conversions might make it difficult to retire its senior debt.) While de-listing was not imminent, it was a situation that had to be addressed promptly.

10. On July 9, 2019, ShiftPixy's board of directors met for the purpose, among others, of considering efforts that might be taken by the company to restore its share price to an acceptable level. One of the considerations before the board was that a rising share price might make it possible to resume honoring the noteholders' conversion demands. Advised by its investment bankers and its investor relations firm, the board authorized a stock buyback program, a program designed, in part, to increase and restore its share price. The stock buyback program was also intended to address the notice of potential delisting from the NASDAQ. It was ShiftPixy's expectation that the buyback program would be good for the company and its stockholders and good as well for the noteholders. As to the latter, if the program were successful, ShiftPixy could resume honoring conversion demands without at the same time risking destruction of the market for its shares.[2]

---

[1] Under applicable NASDAQ rules, ShiftPixy was entitled to an additional 180-day extension before de-listing would be effective.

[2] The provisions of the Notes relating to the prohibition on repurchasing or offering to repurchase shares are fully set forth in ShiftPixy's brief in opposition to the present motion. These provisions prohibit the "repurchase" or "offer to repurchase" shares, which ShiftPixy has not done, and not anything else.

11. The Notes contain negative covenants that ShiftPixy is required to abide by. Among them are prohibitions relating to repurchase of its own securities. For example, Section 7(d) of the June 2018 Note provides in relevant part:

> As long as any portion of this Note remains outstanding, unless the holders of at least 80% in principal amount of the then outstanding Notes shall have otherwise given prior written consent, *the Company shall not*, and shall not permit any of the Subsidiaries to, directly or indirect:
>
> (d) repay, *repurchase or offer to repay, repurchase* or otherwise acquire more than a de minimis number of shares of its Common Stock or Common Stock Equivalents other than as to (i) the Conversion Shares or Warrant Shares as permitted or required under the Transaction Documents and (ii) repurchases of Common Stock or Common Stock Equivalents of departing officers and directors of the Company, provided that such repurchases shall not exceed an aggregate of $100,00 for all officers and directors during the term of this Note; . . . .

(Absher Decl. Ex. A (Emphasis added.)[3]

12. Authorization of a stock buyback program is not within the language of these covenants. And notwithstanding the considerations leading the ShiftPixy board to authorize it, *the company did not implement the stock buyback program*. While it took certain preliminary steps in connection with the program after board authorization, that is exactly what they were – preliminary steps. (ShiftPixy abandoned those steps after Dominion challenged the program in seeking a prohibitory preliminary injunction at the outset of this case.) Moreover, even had Dominion not sought such an injunction, there is no indication that the program would ever have been put into effect.

---

[3] Section 13(e) of the March 2019 Note similarly provides, in relevant part: "The Company shall not . . . directly or indirectly, redeem [or] repurchase any of its capital stock" while the note is outstanding. (Absher Decl. ¶ 11 and Ex. B, Sec. 13(e), at 28.)

13. A determination to institute a program to repurchase shares depended on numerous factors, such as coordination with the company's investment bankers and principal broker dealer, FINRA and NASDAQ rules, trade volume, and others. In short, ShiftPixy has not repurchased a single share of its stock pursuant to the program and it has no current intention to do so. ShiftPixy will not commence share repurchases under the program until it has determined that to do so would not violate negative covenants in the Notes, and would be in its and its shareholders' then-current interest.

14. For purposes of this litigation and to observe the restriction contained in the Notes relating to repurchase of its shares, ShiftPixy represented to the Court (and to Dominion) in connection with Dominion's preliminary injunction motion in this case that if it determined at any time to restart the program by redeeming its shares, it would so notify both the Court and Dominion, providing at least thirty (30) days' notice of intention to do so. I am advised that the Court "so-ordered" that undertaking, converting it into a direction from the Court punishable by contempt.

15. In June 2019, in view of the foregoing circumstances, ShiftPixy elected not to continue to honor the noteholders' conversion demands.

16. I am advised that Dominion seeks to suggest that ShiftPixy lacked a legal or factual basis for its counterclaims and affirmative defenses when they were filed with this Court. That is not true. At the time of pleading its counterclaims, it was not apparent to ShiftPixy that the counterclaims lacked substantial merit. I am advised that ShiftPixy pleaded the counterclaims based on conclusions that had been reached by its then-chief financial officer and outside auditors. The outside auditors had by that time required that ShiftPixy restate financial results by taking a non-cash charge to earnings in the range of $3 million to account for

what the auditors had determined to be issuance to Dominion and other noteholders of excessive numbers of conversion shares.

17. As to its affirmative defenses, I am advised that ShiftPixy pleaded them in its answer in order to preserve them until such time as it could determine it either had or did not have a factual or legal basis on which to plead them. (I was not involved in the preparation or filing of the counterclaims or affirmative defenses, and make these statements based on consultation with other officers of the company and with counsel.)

I declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct. Executed on October 8, 2019, in Irvine, California.

_____
SCOTT W. ABSHER